UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 4:22-CR-184-JFH |
| v. | ) |
| | ) |
| JORDAN JAMES HODGES, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

Before the Court is Defendant Jordan James Hodges's Motion to Suppress (Doc. 22). The District Judge has referred the motion to the undersigned for a Report and Recommendation. *See* 28 U.S.C. § 636(b)(1)(B). On October 12, 2022, the undersigned held an evidentiary hearing, during which witness testimony was given and the parties moved to admit certain documents. (*See* Doc. 33). The undersigned has also considered defendant's motion, the government's response brief, and police reports and other exhibits attached thereto. (*See* Docs. 22, 26).

**I.      Suppression Proceedings**

A motion to suppress is recognized and governed by Rule 12. *See* Fed. R. Crim. P. 12(b)(3)(C). The purpose of a suppression hearing is to "determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the [Constitution]." *United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir. 1982). When making such a determination, "the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a); *see also Merritt*, 695 F.2d. at 1269-70.

"The proponent of a motion to suppress has the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the challenged search." *United States v. Eckhart*, 569 F.3d 1263, 1274 (10th Cir. 2009) (quotations omitted). The burden then shifts to the government to prove that its warrantless actions were justified. *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010). The controlling burden of proof at a suppression hearing is proof by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). "The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court." *United States v. Kimoana*, 383 F.3d 1215, 1220 (10th Cir. 2004); *see also United States v. Andrus*, 483 F.3d 711, 716 (10th Cir. 2007).[1]

Pursuant to Rule 12(d), "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record." The facts set forth below constitute the Magistrate Judge's proposed essential findings, by a preponderance of the evidence, on the defendant's suppression motion, following the consideration of hearing testimony, exhibits, and the parties' written submissions and arguments.

---

[1] When reviewing a district court's denial of a motion to suppress, the Court of Appeals considers the totality of the circumstances and views the evidence in the light most favorable to the government. *See United States v. Torres*, 987 F.3d 893, 899 (10th Cir. 2021); *Kimoana*, 383 F.3d at 1220. The district court's factual findings are reviewed for clear error. *See Torres*, 987 F.3d at 899.

## II.   Background

On May 12, 2020, officers with the Delaware County Sheriff's Office (DCSO) received a report of an abandoned all-terrain vehicle (ATV) located on private property owned by Heather Smith. Deputy Whitney Reynolds went to the address and observed a black Polaris Sportsman 800 twin all-wheel drive vehicle. Deputy Reynolds noted a sticker with the words "American Pride" on the front of the vehicle. She located certain identifying numbers on the ATV and searched a database for stolen vehicles using those numbers.[2] However, she located no report that the vehicle had been stolen.

Deputy Reynolds advised Ms. Smith of her rights regarding the vehicle and documented Ms. Smith's report in case the ATV might later be reported stolen. Ms. Smith informed Deputy Reynolds that she had posted a picture of the abandoned ATV on Facebook, seeking its owner.

Later the same day, an individual named Shawn Anderson contacted officers, reporting that his ATV had been stolen and that the picture posted on Facebook by Ms. Smith was of his stolen vehicle. According to a report by Officer Daniel Christophel, Mr. Anderson reported that several valuable items had been taken from his barn at some point between April 27 and April 29, 2020. Mr. Anderson met Deputy Reynolds at the location where the abandoned ATV had been found, but by that point the ATV was gone. Officer Ron Crawford obtained the VIN for the ATV that Mr. Anderson reported stolen. Officer

---

[2] Deputy Reynolds could not locate the vehicle identification number (VIN). She testified that she was not familiar at the time with where the VIN would be located.

Crawford stated that he had originally owned the ATV and had sold it to Mr. Anderson. Officers with the DCSO added the VIN for the ATV to a national database of stolen vehicles, issued a "BOLO" ("be on the lookout") notice for the vehicle, and asked for extra patrol in the area near Mr. Anderson's property.

On May 19, 2020, DCSO officers, including Deputy Reynolds, met with agents of the Oklahoma Department of Agriculture, Food, and Forestry (ODAFF) to investigate a report that was made to ODAFF. The caller reported that missing cattle had made their way onto the Starrs' property. The caller also reported that there were unusual vehicles and equipment on the property and that several individuals appeared to be "squatting" without permission on the foreclosed portion of the land.

Deputy Reynolds had obtained property records from the county assessor's office indicating that the foreclosed parcel had once been owned by Gerald Starr but had been foreclosed and sold to Bank of America. The foreclosed parcel adjoins property owned by members of the Starr family to the northwest, west, and south. The foreclosed property is bounded on the east by County Road D4610. The entrance to the foreclosed property from the road has a gate, which was locked on May 19, 2020. However, the property was also accessible via the Starrs' land to the north, which was secured with an unlocked gate.

An agent with ODAFF, Dusty Goforth, and other agents spoke with Evelyn Starr at her house just across County Road D4610 from the unlocked gate. After speaking with Ms. Starr, Officer Goforth and others used the unlocked gate and proceeded onto the Starrs' property in search of Gerald Starr. They found an encampment, where a woman spoke with

the officers and gave them a key to the locked gate leading from the road to the foreclosed property.

After the locked gate was unlocked, Deputy Reynolds and DCSO Deputy Thomas Beck entered and proceeded into the adjoining southern portion of the Starrs' property, where they found a second encampment. There, Deputy Reynolds observed a recreational vehicle (RV) with a lock that appeared to have been tampered with, as well as a truck and an excavator. There were other structures nearby, including a shipping container (i.e., CONEX box).

While the officers were looking over these structures, the defendant drove past Reynolds and Beck at what Reynolds estimated to be 50 miles per hour in an ATV. The defendant was riding southward on a "two-track" dirt pathway. After passing the officers to the west, the defendant turned around and rode the ATV back the opposite way on the two-track.

Deputy Reynolds estimated that the defendant was approximately one hundred feet away when she first saw him. She testified that, upon seeing the ATV, she recognized immediately that it was the same one that had been reported stolen the week prior. Deputy Reynolds either approached or blocked the defendant from proceeding further. After stopping, the defendant provided the officers with his name. Deputy Beck located a VIN for the vehicle, and Reynolds searched the number in a database, which showed that the ATV had been reported stolen. The officers further observed a .22-caliber rifle on the ATV.

The defendant was arrested, and officers transported him to DCSO Captain Gale Wells, who was nearby on the property to the north. Meanwhile, Deputy Reynolds searched

the VINs on the RV, truck, trailer, and excavator she had observed at the property. She found that each of these items had been reported stolen.

Subsequently, the defendant was charged by Indictment with knowingly possessing a firearm as a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and knowingly receiving stolen goods within Indian Country, in violation of 18 U.S.C. §§ 1151, 1152, and 662. (Doc. 2).

### III. Analysis

The defendant's motion asserts that the officers lacked reasonable suspicion or probable cause to detain him. The defendant contends that, as a result, the stop was unlawful and evidence arising from the stop should be suppressed. The government filed a response in opposition to the suppression motion, arguing that officers reasonably suspected the defendant was riding a stolen ATV, and therefore the detention and ensuing arrest were lawful.

#### A. Reasonable Suspicion

The Fourth Amendment guarantees citizens the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Those protections apply to investigatory stops. When a law enforcement officer performs an investigative detention of a person, it is referred to as a *Terry* stop. *See United States v. Hernandez*, 847 F.3d 1257, 1267-68 (10th Cir. 2017) (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "Because a *Terry* stop is less intrusive than an arrest, the suspicion required to make such a stop is less demanding than what is required for an arrest." *Id.* at 1268. Still, such a detention is only permissible when an officer has "specific and

6

articulable facts and rational inferences drawn from those facts giving rise to a reasonable suspicion that [the defendant] was involved in criminal activity." *Id*.

Suspicion is reasonable if the police have "'a particularized and objective basis for suspecting the particular person stopped' of breaking the law." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014)). Probable cause exists if the facts and circumstances would lead a prudent man to believe that a suspect had committed or was committing a crime. *Torres*, 987 F.3d at 901–02.

An investigative stop is supported by reasonable suspicion only if it is "justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981). The officer must have "reasonable suspicion to believe that criminal activity may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). "For reasonable suspicion to exist, an officer must 'articulate something more than an inchoate and unparticularized suspicion or hunch.'" *United States v. Moore*, 795 F.3d 1224, 1229 (10th Cir. 2015) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Stated differently, before initiating an investigative stop, an officer must have "a particularized and objective basis for suspecting an individual may be involved in criminal activity." *United States v. Pettit*, 785 F.3d 1374, 1379-80 (10th Cir. 2015) (quoting *United States v. Johnson*, 364 F.3d 1185, 1194 (10th Cir. 2004)).

The existence of objectively reasonable suspicion of illegal activity "does not depend upon any one factor, but on the totality of the circumstances." *United States v. Soto*, 988 F.2d 1548, 1555 (10th Cir. 1993). In deciding whether the government has met its

burden of showing reasonable suspicion, we "judge the officer's conduct in light of common sense and ordinary human experience," *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997). This "evaluation is made from the perspective of the reasonable *officer*, not the reasonable *person*." *United States v. Guerrero*, 472 F.3d 784, 787 (10th Cir. 2007) (internal quotation marks omitted) (emphases in original).

### B. The Government Established Reasonable Suspicion by a Preponderance of the Evidence.

The defendant argues that the officers had no information or evidence to suggest that Mr. Hodges had committed, was committing, or was about to commit any offense under state or federal law. He argues that he "was simply riding an ATV on his own family's property" and was a mere "bystander who happened to come along during a police investigation of squatters." (Doc. 22 at 5). The defendant contends that the officers detained him based on no more than a hunch, arising from the defendant's proximity to their investigation of squatters, which he argues is impermissible under *Ybarra v. Illinois*, 444 U.S. 85, 96 (1979).

In *Ybarra*, officers were executing a search warrant for drugs and other contraband in a tavern, based on information that the bartender, "Greg," was storing packets of heroin behind the bar. Upon entering the tavern, the officers proceeded to conduct "cursory" pat-down searches of several customers who were present, including the defendant. In so doing, the officers found a cigarette pack containing packets of heroin in the defendant's pocket. The Supreme Court held that the officers lacked the necessary probable cause to conduct patdown searches of the patrons, noting that the search warrant complaint "did not

8

allege that the bar was frequented by persons illegally purchasing drugs." *Id*. at 90. Accordingly, the officers lacked probable cause "to believe that any person found on the premises of the [tavern], aside from 'Greg,' would be violating the law." *Id*.

Here, testimony at the evidentiary hearing and contemporaneous police records show that the officers had more than a mere hunch that the defendant was involved in criminal activity.[3] Deputy Reynolds had investigated and personally inspected an abandoned ATV one week earlier. The ATV the defendant was riding had the same color body and otherwise largely matched the characteristics of the ATV Deputy Reynolds had recently seen on Ms. Smith's property. It was, in fact, the same ATV, as later confirmed by the VIN number. (*See* Docs. 22-1, 26-1, 26-5, 26-6).[4]

Additionally, the officers were investigating stolen property, which they believed to be stored nearby, and had observed items at the second encampment including an RV with a lock that appeared to have been tampered with, an excavator, and a truck, that matched the description of property stolen from Mr. Anderson's barn. Also at the encampment was

---

[3] Consistent with Tenth Circuit guidance, the review of evidence by the undersigned begins with evidence introduced at the hearing; however, the Court's review is not limited to that evidence. *See United States v. Poe*, 556 F.3d 1113, 1121 (10th Cir. 2009) (citing *United States v. Parra,* 2 F.3d 1058, 1065 (10th Cir. 1993)).

[4] Deputy Reynolds testified that the ATV's seat appeared to be a different color than the one she had observed on Ms. Smith's property; however, she stated that she considered the seat color irrelevant because the seat of an ATV can be changed out easily. Deputy Reynolds also testified that when she encountered the defendant on May 19, 2020, she observed the outline of a sticker on the front of the ATV that matched the location and shape of an "American Pride" sticker noted in her May 12, 2020 report of the abandoned ATV.

9

a CONEX box, which Deputy Reynolds knew another party claimed to own and had complained that it was being occupied by trespassers.

Thus, unlike the officers in *Ybarra*, Deputy Reynolds was aware of specific facts that supported a reasonable inference the defendant was engaged in criminal activity. Although the fact that a stop occurred in a high-crime area cannot alone serve to establish "reasonable suspicion," courts have repeatedly held that such a characteristic of the location of the stop is relevant to the analysis and may be taken into consideration. *See, e.g., Illinois v. Wardlow,* 528 U.S. 119, 124 (2000) ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."); *see also U.S. v. Goebel*, 959 F.3d 1259, 1263 (10th Cir. 2020).

Additionally, facts supporting an inference that an item is stolen property may further support an officer's reasonable suspicion. *See, e.g., United States v. Burleson*, 657 F.3d 1040, 1048 (10th Cir. 2011) (holding that, where officer stopped defendant because he was walking in the middle of the street and carrying an unleashed dog, which concerned the officer because of recent reports of dog thefts in the city, it was "objectively reasonable for an officer in that situation not only to ask questions as to whether the dog actually belongs to the detainees, but also to obtain their names and confirm their identities in case the dog is later reported stolen"). In *United States v. Sanchez*, an officer was on patrol after receiving a warning from police dispatch to look out for a stolen silver Hyundai. 13 F.4th 1063, 1067-68 (10th Cir. 2021). The officer noticed an unoccupied Hyundai in an Extended Stay hotel parking lot, where the officer had found stolen vehicles before. He also found

the vehicle suspicious because it was parked in an odd position and the license plate was registered to an older Hyundai, whereas the one he saw in the parking lot appeared newer. *Id*. at 1068. After a Lexus pulled in next to the Hyundai and defendant exited the Lexus, then crouched down between the two vehicles with a toolbox, wearing a trench coat, officers approached. While one officer began speaking with the defendant "in a mellow, conversational tone," the defendant's demeanor soon changed and indicated he was about to flee or could have weapons. *Id*. Officers commanded him to put his hands on his head for a pat-down search. The defendant fled and was tased, then tackled, leading to his arrest for being a felon in possession of a firearm.

The Tenth Circuit held that the officers "had reasonable suspicion of criminal activity from the inception of their encounter with [the defendant], justifying a seizure." *Id*. at 1071. The court noted the officers' awareness that this particular parking lot was a repository for stolen vehicles. *Id*. Combined with other facts the officers noted about the Hyundai and defendant's behavior, the facts supported a "rational inference[] that the Hyundai was stolen" and "reasonable suspicion that [the defendant] was committing or attempting to commit a criminal offense, justifying an investigatory encounter." *Id*.

Here, while the defendant's proximity to squatters did not itself establish reasonable suspicion, the totality of the circumstances supported a reasonable suspicion that the defendant was riding a stolen ATV. First, the defendant was riding on a track near where officers had just seen other items they suspected as having been stolen. Second, the defendant was riding an ATV with similar characteristics to the one Deputy Reynolds knew had been reported stolen, and that was the subject of a BOLO warning. Furthermore,

Deputy Reynolds had personally examined the same ATV the previous week while investigating Ms. Smith's report, and she knew that the ATV abandoned on Ms. Smith's property had been moved by the time she returned to the same site with Mr. Anderson to identify it. Deputy Reynolds also testified that she immediately recognized the ATV driven by the defendant as the same stolen ATV she had investigated a week earlier.

Thus, the facts supporting Deputy Reynolds' suspicion were both objective and particularized. These circumstances gave rise to an objectively reasonable suspicion that the defendant was operating a stolen vehicle. As in *Sanchez*, "[t]here may have been an innocent explanation for [the defendant's] conduct, but the officers did not have to rule out innocent conduct to have reasonable suspicion." *Id.*; *see also Goebel*, 959 F.3d at 1267 (citing *Arvizu*, 534 U.S. at 277). Here, the established facts, and the rational inferences that can be taken from them, justified a brief investigative stop to assess whether the ATV was stolen. As such, the seizure of the defendant did not violate his Fourth Amendment rights.[5]

## IV.  Conclusion

For the reasons set forth above, the undersigned Magistrate Judge **recommends** that the District Judge deny the defendant's motion to suppress.

---

[5]  The government argues further that, under the "open fields" doctrine, the defendant did not have a reasonable expectation of privacy. However, because the detention here was supported by reasonable suspicion, the Court need not address this alternative argument.

In accordance with 28 U.S.C. § 636(b) and Fed. R. Crim. P. 59(b)(2), a party may file specific written objections to this report and recommendation within 14 days. Any such objections must be filed on or before November 14, 2022.[6]

If specific written objections are timely filed, Fed. R. Crim. P. 59(b)(3) directs the district judge to:

> consider de novo any objection to the magistrate judge's recommendation. The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions.

Fed. R. Crim. P. 59(b)(3); *see also* 28 U.S.C. § 636(b)(1). Failure to object in accordance with Rule 59 waives a party's right to appellate review. *See Goebel*, 959 F.3d at 1266-67.

DATED this 28th day of October, 2022.

*Christine D. Little*
Christine D. Little
United States Magistrate Judge

---

[6] The 14-day period ends on Friday, November 11, 2022, which is a legal holiday.